Okay, come on up. Don't be shy. Second case number 21-11328, Marius Brown versus the Wrigley Manufacturing Company et al. Ms. Molden, good morning. Good morning, Your Honors. My name is Regina Molden, and I represent the appellant plaintiff, Marius Brown. The district court decision should be reversed for three reasons I'd like to speak about today. As a threshold matter, the district court repeatedly relied upon defendants' subjective, unspecific, and While conceding the defendants promoted less qualified employees, the district court then went on to decide that there was no probative value in the record, no probative evidence in the record of intentional discrimination. And finally, the district court erred by relying on temporal proximity alone to conclude that Brown failed to state a claim for race retaliation. Now I want to talk a little bit more about the court's reliance on subjective criteria. In this case, Mr. Brown applied for five different positions during the relevant period. The district court found that Mr. Brown was either equally or more qualified than the selected candidates with respect to all five positions. Do you think viewing the evidence in the light most favorable to him that he was more qualified for every promotion or were there some where he was the same as the person who was selected? Your Honor, I think that with respect to at least one, and the district court conceded that he was more qualified. With respect to the other positions, the court did find that he was equally qualified, but I would say that if you look at why they were equally qualified, it's problematic. Because Wrigley created a system to create leeway to promote or to make lesser qualified candidates equally qualified. It's nowhere in Wrigley's policy that you get to place the candidate that you wish to have the position in an interim role so that person gets to fill the position for several months before it's actually posted, even though they are required to interview still, so that when it comes time to interview, certainly that candidate's responses are going to be far greater, far more detailed, far more passionate than Mr. Brown or a person who has not had the opportunity to serve. So the district court concluded that they were equally qualified. I disagree because of the reason why they were equally qualified. Can I ask you a question about that? Yes. So I understand what you're saying, and I think it's a good point, but what should Wrigley have done if it had a vacancy that it needed to fill temporarily? What should it have done instead, or could it have done what it did if it had simply put it into its policies? I think either put it in its policy, but I view it as an end run around posting a position. It's no different. So you can have a need for an interim position, announce it, give everybody an opportunity to fill it. Wrigley's position is, well, Mr. Brown never asked to be placed in the interim position. Well, you don't know that the interim position is going to become available, so you don't know to ask for it. So I think that if just giving everybody the same opportunity, so whether that be by putting it, making it part of your policy or by advertising. I've dealt with many, obviously, employment discrimination cases, and there are companies that announce interim roles, interim positions. You can announce it for, or leave it open for two days, but at least give everybody a chance to apply for it. What should they do during those two days when it's open if they need to have somebody supervising? The two days while it's posted? Yes. I think that they have, so they don't learn, I don't think that they learn about these positions one day and have to fill it that same day. I think they have noticed that a person is going to leave, so I don't think they're in a position where they have to act right away. So. Thank you. So again, the district court relied upon these subjective reasons, and as I was stating, they were either, the candidates who were selected were either less qualified or at best equally qualified. I want to talk just a little bit about the positions that he applied for. The first position was a shift lead position in the packaging department. Mr. Brown was performing the exact same job in the exact same department, so he wanted a promotion, but really and truly it was just a change to the day shift. Wrigley told Mr. Brown he was not qualified, and it was this position where the court conceded that the selected candidate was less qualified. I don't, the reason for the person being supposedly more qualified was the subjective reason that Mr. Slaughterback, which was Mr. Brown's direct supervisor gave, he said, you know, he's just not ready. He initially told him outright, I don't want you on day shift with me. I have someone else that I want, and initially said, I'm not going to give you the interview at all, and then Mr. Slaughterback reversed course and gave him the interview, but of course the conclusion was the same. So we think that was a clear, clear indication that this, that something else was going on. He carried his prima facie case, and we don't think that that subjective reason alone was sufficient to deny Mr. Brown that promotion. Again, exact same job he was already doing. He next applied for the processing day shift. Did that position he applied for to slide into the day shift, would that have come with additional responsibilities or pay increase, or was just sort of a lateral position to a better shift? It was more a move to a better shift, better shift, and you know, again, he was already, and I'll say this, to add insult to injury, then he had to, Mr. Brown, once he was denied the promotion, he had to train the person who actually got the position instead of him, and this is something that he has faced numerous times at Reg League. As to the processing day shift position, again, he was found to be equally qualified. The district court just relied upon the same subjective reasoning that his supervisor offered. He's just not ready. But in a, I understand your argument about the very first position you mentioned, right, where some objective criteria indicated that he was better qualified. Correct. But when you have, in a hypothetical situation, if you have two people who are equally qualified on paper, isn't the decision about who to promote going to come down to some subjective evaluation of what that person's expectations are, whether the person can grow into the position, whether the person can handle the added responsibility, how he or she will be with supervisory aspects? I mean, when you have people who are equally qualified under the benchmark set by the employer, how else can you make a decision without engaging in some subjective consideration? And I agree that subjective reasoning comes into play to a degree, and this court has said that, that you're going to have to consider that, but it can't be enough standing alone. And if you're going, for every position, it was the same response. And when you kind of peel back the onion and you look at exactly what he said, first of all, there's a question of fact as to whether or not Mr. Slaughterback really believed that Mr. Brown had problems with conflict of resolution. Mr. Brown's testimony was that they'd never talked about this, that when Mr. Brown started asking about why am I not being promoted, that Mr. Slaughterback then added those comments to his review. And the district court even noted that there was no record that Mr. Slaughterback had made any indications or any notes about this being a problem before. So the district court conceded that. With Mr. Brown's testimony coupled with that fact, we think that what the concern was, it related to one incident, one incident. Mr. Slaughterback said that employees reporting to Mr. Brown were calling in and one problem, one employee had a problem with another employee, and Mr. Brown didn't seem to be doing anything about it. That was it. That was it. So there is nothing, no articulated reasons for this supposed conflict resolution problem, and I see my time is up. All right. Thank you very much, Ms. Molden. You've saved your time for rebuttal. Thank you. Mr. Davies. Good morning, and may it please the Court. My name is Thomas R. Davies. I'm here on behalf of Wrigley Manufacturing Company and the two individual defendants. I would like to start with just a couple of general comments about the arguments that were advanced by plaintiff in in his brief. He repeatedly referred to his stellar performance. The fact of the matter is the record is clear that throughout the entire time at issue, he received a meets expectations rating, which is the middle of a five-step rating process. If we think of it back to at least when I was in school, he got C grades, not bad grades, but not exceptional grades, certainly not stellar grades. They make a point of the fact that he received regular wage increases. People that get meets expectation ratings get regular rate increases. So there is nothing about his performance record that demonstrated stellar performance. Can I ask you a question about one of the first things that your friend on the other side of the aisle mentioned, and that is the fact that for two of the positions, there were interim positions, and people were appointed, and the people who were in those interim positions ultimately got the job. And it seems like, why isn't that sort of a backdoor way of picking who you want without opening it up? Because that person is always going to have the advantage. It would seem that they would have some advantage, but that would only be if they did well in that interim role. If they didn't do well, it would hurt their chances, certainly. And the way the process works, interim roles, as you noted in your question earlier, come up sometimes with very little notice. They need to be filled. Some associates have expressed interest to their managers that if something comes up, I'd love the chance to move into here or move into there. So there's naturally some fluidity to that process. It's not clear-cut in terms of how those roles are assigned, but it is not necessarily a way of, a backdoor way of avoiding the normal process. And I understand, you know, sometimes these needs arise and there's not much notice. But, and I understand that theoretically someone could be assigned to an interim position and then apply for the open position and not get it. But on this record, there were two times there were interim positions and both times the person who was assigned received the position. And so that's what we have to look at. And we don't have any other information about interim positions where people weren't assigned or what the process was for determining who would be the interim, the interim appointment. So I just wanted you to have an opportunity to speak to that. Yes. There's also certainly no evidence in the record that that interim role was used in a manner to engage in discrimination. There's simply no evidence, you know, one way or the other about the overall, how that interim role would have been filled over a course of a couple of years at the plant back in 2016, 17, 18. So just to play devil's advocate here, my guess is that the plaintiff would assert that, that obviously no one's going to say we're picking this person because he's not Black, right? They're not going to say that. But they could still be making that decision based on the person's race. And if they're making that decision based on the person's race, that obviously violates the law. I'm sure you would agree with me that that's the case. Obviously, Your Honor. Right. So I guess the question is, since we have five of these passovers, and two of them involve interim appointments, you know, I'm wondering whether there's enough there to create a dispute of fact as to what the reason was behind why the interim appointments were made. And maybe you just want to address that as to, you know, the pretext issue. Yeah, I will, Your Honor. There's no evidence in the interim position. There's no evidence in the record to show that other Black associates who did express interest in interim positions were not given them. There's simply no evidence. And obviously, it's plaintiff's burden to provide evidence of apparent discrimination in various parts of the process. The record is silent as to much of that. Thank you. Another point that I would like to address is that, you know, and it's because of the way, you know, this case was presented, the Court might get the impression that this was always a horse race between two people. The first role that, you know, was discussed here, the February 21, 2017, packaging day shift role, there were 22 people that sought that position. More whites than Blacks. You know, these are very competitive positions that a lot of people are interested in. And I want to address a point that the plaintiff made in her argument. She said that, you know, there was no evidence in the record that Mr. Slaughterback had made his concerns known about the conflict management skills of plaintiff. Again, Mr. Slaughterback had become his supervisor in June of 2015. We have evidence that in this, you know, he says in his, you know, deposition and the declaration that he had communications with Mr. Brown in the summer and fall of 2016. There's some dispute about that, but it is the Court clearly found that he had entered into the company's performance review system in January of 2017. His concerns about Mr. Brown's conflict management skills, which was before the two roles that, you know, he expressed some concerns about letting him advance to. He explained clearly that those concerns would be amplified if he was on a day shift role because, although as the, you know, my colleague explained, they are equivalent roles in terms of pay. You know, the undisputed testimony is that they have higher visibility because of the presence of more people on shift, regular plant management is in the building, and he was concerned that in that environment that Mr. Brown's skills would become more apparent. Now, or lack thereof. Or lack thereof, yes. Now, we're at summary judgment, so any disputes as to what Mr. Slaughterback told Mr. Brown or didn't tell him, the tie goes to Mr. Brown. So, with regards to that entry that Mr. Slaughterback said, what did that entry consist of? It was a, the way the performance review process works, you know, Mr. Brown entered his information on his performance review, and then there's a place for manager feedback that is entered electronically. The Court specifically found that it is undisputed that that information was entered on January 17th, I think, or mid-January 2017. It's disputed whether, you know, the way the system works, the system is supposed to forward an email to Mr. Brown advising him that that entry has been made. Mr. Brown denied receiving any such said that, you know, it's undisputed that that entry was made before Mr. Slaughterback had his concerns and didn't want to advance Mr. Brown for the two, first two positions. Could you address the theory of the mosaic of circumstantial evidence? The magistrate judge found it, at the end of the day, unpersuasive. If I remember the magistrate judge's report correctly, the magistrate judge said that all the tiles of circumstantial evidence didn't really work except for one, potentially, and that was the possible discrimination suffered by Mr. Sutherland, right? Yeah, he raised that point, but it indicated that there was insufficient evidence to establish a link with respect to Mr. Sutherland's claim of discrimination because it wasn't even clear who the decision makers were, things like that. When you put all those tiles that Mr. Brown presented in combined with the denials of promotion, you don't think there's enough? No, Your Honor, I certainly don't think there's enough. I think, and as the court pointed out, essentially it's just rearranging the tiles or deck chairs on the Titanic, in many respects. One of this court's leading opinions that was relied upon heavily by plaintiffs in his brief was the Lewis case, and I think Judge Rosenbaum was involved in that case, but Lewis is one of those cases where this court did find there was this mosaic of patterned evidence that could amount to a discrimination claim, but, for example, the court stated, Ms. Lewis has presented evidence from which a jury would be entitled to conclude that the city's actions in regards to Ms. Lewis were extraordinarily arbitrary, and then went on to detail the fact that she was told she had to stay home. They put her on temporary leave, but then fired her for not showing up for work. There was evidence that the supervisor in the police department had indicated that he had different assignments for lady detectives as opposed to male detectives. There was hard evidence, real significant pieces of information that, when combined, presented that mosaic that this court has acknowledged, but I think this case falls far short of that, Your Honor. The other point I would like to make, and it directly... I'm sorry, before you get to that point, there were five positions that he applied for, right? Correct. And was everyone who was not black? Yes, that's correct, Your Honor. Okay. All right. First of all, in getting back to that first position, and I think the district, Judge Fuller, and I've been practicing for a long time, his analysis of this information and evidence and claims was one of the most thorough and detailed I've ever seen. The individual selected for the first position had more years of service than Mr. Brown. He had a technical degree, and Mr. Brown relies heavily on the fact that he had a bachelor's degree, but, you know, the technical degree may actually be more helpful in the job. And in analyzing the various times, comparing the skill sets of different people, the judge necessarily indicated that what may be, you know, more years of service, experience here, whatever, those are within the realm of the decision maker, and, again, there's repeated cautions always about the court is not the ultimate personnel department for the ultimate answer in the case is because I haven't gone back to look into the record itself. But, you know, you look at one or maybe two of these promotions individually, and you're like, I think the magistrate judge in the district court judge got him right. I think Mr. Brown hasn't shown enough evidence of pretext to get to a jury. But then you add three, four, and five, it starts to look a little bit different, and that's why I asked you about the mosaic. But, again, Your Honor, you know, and the court noted this, these are different panels of managers involved in these decisions. In each case, there were minority managers involved. In the third of the selection process, the hiring manager who is the ultimate decision maker was Corey Adams, who was an African American manager, and he outlined why he felt Mr. Brown's performance in the interview process didn't give him confidence that he would be able to do the job. On that point, this court in the Bass v. Board of County Commissioners case said, and it's a 2001 case, the court reaffirmed that a subjective reason for an employer's action, such as poor interview performance, can be as legitimate as any other reason. And then it goes on to say, an interview is frequently necessary to address qualities that are particularly important in supervisory or professional positions. And then they detail the kinds of comments that were made by the managers in this case, and then state, because the interviewers explained the grounds for their subjective evaluation with reasonable clarity and specificity, the county met its burden of producing a legitimate non-discriminatory reason for not hiring Bass as a training instructor. Now, I encourage the court to compare the comments of these managers versus the comments made by three separate managers in our case, and I think they'll be clearly above and beyond the Bass standard. Now, obviously, the Bass case was found for many other reasons, including the fact that it was clear and admission that the entire interview system in Bass had been created to allow leeway to get a desired outcome in the process. That fact is clearly not part of this case. This process of placing jobs has been in place for a long time, and there's no evidence overall that it's used for any discrimination whatsoever. We think the court's decision is, you know, correct, and urge this court to affirm it. Thank you. All right. Thank you very much. I'd like to address a couple of points that my opposing counsel raised. I want to speak first to, again, go back to the interim positions. There were five positions total. Three, in three of those positions, the candidate held the job on an interim basis first. So, no Black person ever has been placed in an interim role at Wrigley. This is in the record. Wrigley does not dispute this. There's something really wrong with that. There have only been three Black people promoted into management at Wrigley. This is undisputed. One of those promotions... Over the course of what time? About 20 years. The HR person that I, Mr. Bento, that I deposed had been there 20, 30 years, so I can at least say for as long as he's been there. Do we have numbers on how many Black employees worked there over the years? The record shows, I don't know how many worked over the years, but it is about 40 percent Black. So... And that's in the record? Yes, that is, Your Honor. This is undisputed. I'm sorry, do we know overall how many workers worked at the company? For whatever reason, a thousand employees or so stands out in my mind. Do you know if that's in the record? That's where it stands out from, so it is in the record. Okay, thank you. To that point, the magistrate judge referring to statement of undisputed material facts by Mr. Brown says that there are approximately 1,000 employees at the plant. Yes, sir, that's correct. So that's the number. So you have a thousand, and this kind of gets into the mosaic. You have all these Black employees who work there who don't advance beyond the level of Chifley. Mr. Slaughterback, who happened to be my client's direct supervisor and who refused to interview him on occasion to support his application for promotion, was at the center of at least three race discrimination complaints, all pointing to the exact same problem, failure to promote. So we know that Black people who have master's degrees have left because of Wrigley's failure to promote Black people. So when you look at the fact that no Blacks have ever served on an interim basis, five people who were equally or less qualified than Mr. Brown were promoted over Mr. Brown, even when Mr. Brown tried to get a promotion to the exact same position that he was already holding. And when you look at the person who is at the center of all of this, that being Frank Slaughterback, being the problem here, and you look at the reason that Mr. Slaughterback gave for his supposed conflict resolution problem, and that is an employee complained that Mr. Brown wasn't doing enough to address a problem. Now, Mr. Brown didn't even know what he was talking about. He had never heard anything about it. And yet, that has served as a bar to his ever being promoted at Wrigley. And even with respect to all the different panels interviewing Mr. Brown, they all came back with subjective reasons. You're not technical enough. You didn't seem excited enough. All of those are... Mr. Brown doesn't know what he can improve. He doesn't know what to improve upon. Because this court has said, you need to articulate clear, specific, objective reasons. And that didn't happen in this case. We only know about a conflict that Mr. Brown didn't address fast enough. And again, if you look at Mr. Slaughterback's comments, that's in dispute. Again, Mr. Brown says, this came up only after I started questioning why I was not interviewed. So we believe that there was enough information, there was enough evidence in the record to at least create an issue of fact as to whether or not Mr. Brown was denied promotions repeatedly despite having interned for this company, having no write-ups, having no problems with the company. We believe that his failure to be promoted was based on his race and that there is sufficient evidence in the record that would at least create an issue of fact in that regard. And so we would respectfully ask that the district court's decision be reversed. All right. Thank you. Thank you both very much.